# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

x
:
BELLWOOD CORP.,                                          :     Civil Action No.  5:21-cv-00320
GREENBRIER HOTEL CORP.,                                  :
GREENBRIER GOLF AND TENNIS CLUB CORP., :               Complaint
GREENBRIER MEDICAL INSTITUTE, LLC,                       :
THE GREENBRIER SPORTING CLUB                             :
DEVELOPMENT COMPANY, INC.,                               :
THE GREENBRIER SPORTING CLUB, INC.,                      :
JUSTICE FAMILY GROUP, LLC,                               :
JAMES C. JUSTICE COMPANIES, INC.                         :
JUSTICE FARMS OF NORTH CAROLINA, LLC,                    :
JUSTICE LOW SEAM MINING, INC.,                           :
OAKHURST CLUB, LLC,                                      :
TAMS MANAGEMENT, INC.                                    :
TRIPLE J PROPERTIES LLC,                                 :
JAMES C. JUSTICE II,                                     :
CATHY L. JUSTICE, AND                                    :
JAMES C. JUSTICE III                                     :
                                                         :
        *Plaintiffs*.                                    :
                                                         :
v.                                                       :
                                                         :
CARTER BANK & TRUST,                                     :
MICHAEL R. BIRD,                                         :
KEVIN S. BLOOMFIELD,                                     :
ROBERT M. BOLTON,                                        :
ROBERT W. CONNER,                                        :
GREGORY W. FELDMANN,                                     :
CHESTER A GALLIMORE,                                     :
CHARLES E. HALL,                                         :
JAMES W. HASKINS,                                        :
PHYLLIS Q. KARAVATAKIS,                                  :
LANNY A. KYLE,                                           :
E. WARREN MATTHEWS,                                      :
CATHARINE L. MIDKIFF,                                    :
JOSEPH E. PIGG,                                          :
ELIZABETH LESTER WALSH,                                  :
LITZ H. VAN DYKE, AND                                    :
JOHN AND JANE DOES.                                      :

*Defendants*.

## COMPLAINT

Plaintiffs Bellwood Corp., Greenbrier Hotel Corp., Greenbrier Golf and Tennis Club Corp., Greenbrier Medical Institute, LLC, The Greenbrier Sporting Club Development Company Inc., The Greenbrier Sporting Club, Inc., Justice Family Group, LLC,  James C. Justice Companies, Inc., Justice Farms of North Carolina, LLC, Justice Low Seam Mining, Inc., Oakhurst Club, LLC, TAMS Management, Inc., Triple J Properties LLC (collectively, the "Justice Entities"), James C. Justice II ("Governor Justice"[1]), James C. Justice III ("JCJ III") and Cathy L. Justice (each a "Plaintiff," and collectively two or more, "Plaintiffs" or the "Justices") file this civil action under federal law, and West Virginia and Virginia state and common law for direct, consequential and punitive damages, costs of suit, and such other relief as may be just and proper against Defendants Carter Bank & Trust ("Carter Bank"), Michael R. Bird, Kevin S. Bloomfield, Robert Bolton, Robert W. Conner, Gregory W. Feldmann, Chester A. Gallimore, Charles E. Hall, James W. Haskins, Phyllis Q. Karavatakis, Lanny A. Kyle, E. Warren Matthews, Catharine L. Midkiff, Joseph E. Pigg, Litz H. Van Dyke, and Elizabeth Lester Walsh (collectively, the "Carter Bank Directors"), certain John and Jane Does who are or were "institution-affiliated parties" (as defined in 12 U.S.C. § 1813) of Defendant Carter Bank at all relevant times and participated in the conduct described herein ("John and Jane Does", together with the Carter Bank Directors, the "Individual Defendants", each a "Defendant", and collectively two or more, "Defendants") for, among other things, violating anti-competitive behavior statute, breach of contract and in particular the covenant of good faith and fair dealing, and breach of fiduciary duties and aiding and abetting breach of fiduciary duties relating to

---

[1] James C. Justice II currently serves as Governor of West Virginia.

financing arrangements between Plaintiffs and Defendants.  Through this Complaint, Plaintiffs

seek damages of not less than approximately $421 million and a declaratory judgment that,

among other things, the loan modifications, including, without limitation, the granting of certain

security, guarantees, and releases and reaffirmations provided by Plaintiffs to Defendants,

implemented by Defendants beginning in fall 2017 relating to such financing arrangements (but

not the debt obligations themselves underlying such financing) are unenforceable against

Plaintiffs and that Defendants are not entitled to take any action to realize upon such loans (or

collateral therefor or guarantees thereof) as may become due and payable without providing

Plaintiffs a good faith opportunity to repay those loans.

Based upon personal knowledge, information, and belief, Plaintiffs specifically

allege:

## **INTRODUCTION**

1.      The Justice family has been operating businesses since 1971.  Over that time

period, the Justice family has directly employed thousands of people in various states in the

country, including but not limited to Alabama, Kentucky, North Carolina, South Carolina,

Tennessee, Virginia and West Virginia.  These operations have also resulted in secondary jobs

for thousands of additional people.  The Justices, specifically Governor Justice, have been

committed to the communities where these jobs are created including giving to a variety of

philanthropic concerns, but most notably giving to organizations that involve local youth.  In

addition to the giving of money to numerous schools, universities, and other organizations,

Governor Justice has also given his time, coaching the Greenbrier East High School Girls'

Basketball team for the past 22 years and serving as the President of the Beckley, West Virginia

Little League since 1992.  Today the Justices operate coal mining interests in West Virginia and

Virginia, steel segment interests in Alabama, agricultural interests in West Virginia, Virginia and South Carolina and hospitality segment interests in West Virginia.  Today, the Justice Entities directly employ more than 2,000 people and indirectly thousands more.  The Justices' operations maintain longstanding employees, including many having decades of employment.

2.      The late legendary Virginia banker, Worth Harris Carter, Jr. ("Worth Carter"), founded his first bank in the 1970s, First National Bank of Rocky Mount.  Between 1974 and 1998, as Virginia banks were purchased by large out-of-state banks, Worth Carter organized and opened ten new and separate community banks throughout Virginia.  Under Worth Carter's leadership, all of the banks merged to create Carter Bank & Trust in December 2006.

3.      Governor Justice and Worth Carter met in 2001.  As Worth Carter sought to expand his banking businesses, he actively pursued a commercial lending relationship with Governor Justice and his growing agricultural, mining and hospitality operations.  Worth Carter prided himself on making loans and building banking relationships by establishing relationships of trust with his borrowers.  For Worth Carter, a handshake and his word were paramount.  When Worth Carter and Governor Justice began and grew their financing relationship, they understood that the relationship was premised on mutual expectations of good faith and honor.

4.      Governor Justice knew that Worth Carter's banks were not the biggest or most prestigious of banks.  That said, consistent with his commitment to faith, family and community, Governor Justice also saw the value of doing business with community banks.  Governor Justice felt that he and his family business could rely on Worth Carter and his reputation to treat them fairly.  And for nearly 16 years, that was true.

5.      While their financing relationship started in 2001 with a single real estate loan of approximately $4.5 million, by the end of 2011, Carter Bank had grown the relationship to over

$170 million in the form of 20-year loans to the Justice Entities.  The relationship continued to grow to over $775 million by the end of 2016 and the outstanding loan balance was paid down to approximately $740 million at the time of Worth Carter's death.  As of the date of this Complaint, the Justice Entities have approximately $368 million of outstanding loans with Carter Bank.

6.      This relationship has been massively profitable for Carter Bank.  Over the duration of the relationship, the Justice Entities have paid approximately $238.5 million in interest and fees.  Over the same time period, Carter Bank has suffered no losses on its loans to the Justice Entities.  In addition, the Justice Entities have paid down $407 million of outstanding debt over this time.

7.      In early 2017, Worth Carter passed away.  By that time, Governor Justice's relationship with the banking legend was so expansive and personal that Governor Justice was asked to give the eulogy at Worth Carter's funeral.  Governor Justice was honored by this request from Worth Carter's family and delivered a heart-felt eulogy in memory of his long-time friend and business partner.  At the time of Worth Carter's death, the Plaintiffs had transitioned to utilizing Carter Bank as their near-exclusive financing provider.  They felt comfortable with this decision because when the 20-year term loan structure was combined with the strength of the relationship of the parties and because the terms agreed to were based on Worth Carter's determination that the Plaintiffs' loans were backed by strong assets, supported by valuable operations, secured by desirable collateral and run by people whom he could trust.

8.      Unfortunately, that sad day in 2017 marked a distinct turning point in the relationship between the Justice Entities and the institution that Worth Carter left behind as the relationship abruptly and rapidly began to deteriorate.  Following Worth Carter's death, Litz Van

Dyke ("Van Dyke") and Phyllis Karavatakis ("Karavatakis") took over management

responsibilities as Carter Bank as Chief Executive Officer and (then) President, respectively.

Almost immediately, newcomer Van Dyke and Karavatakis, Worth Carter's long-time associate,

exhibited growing hostility toward the Justice Entities and the Justices personally.  This hostility

came despite what was then an over 15-year mutually beneficial relationship during which the

Justice Entities had consistently and timely serviced all debt owed to Carter Bank (and its

predecessors).

       9.      Rather than continuing to work with the Plaintiffs and living up to its mission

statement, published on its website, to serve as the "lifetime financial partner for [their]

customers," since 2017, Defendants instead have resorted to bad faith and unprofessional

conduct towards Plaintiffs, including engaging in egregious misdirection that had the effect of

inducing the Justice Entities into technical default, which Defendants then used as leverage to

demand additional protection and security in the form of previously unavailable cross-default

provisions in multiple loan agreements, broad-based cross-collateralization, and severely

accelerated maturity dates.  Moreover, Defendants repeatedly demanded unconsciously broad

release and reaffirmation agreements unsupported by fair and adequate consideration in a blatant

attempt to rubber stamp their overreaching tactics and insulate them from judicial review.

During this time, Defendants also engaged in arbitrary conduct that disrupted Plaintiffs'

businesses, including without notice, reason or cause, refusing to fund advances under a $64

million construction loan to the Oakhurst Club, LLC ("Oakhurst") pursuant to the terms of a loan

agreement and note in connection with which Defendant Carter Bank held a deed of trust on the

certain properties as collateral.  Without that financing, construction could not be completed,

causing catastrophic damage to Oakhurst and the other Greenbrier Entities (as defined below),

including, without limitation, the loss of sale proceeds (an average of $625,000 per lot) on 367 lots.

10.     This pattern of egregious behavior reached new heights during the eight weeks (and particularly the ten days) prior to the date of this Complaint as Defendants have stonewalled the Justice Entities' refinancing of a substantial portion of the outstanding debt owed to Carter Bank with a new lender.  Although the Justice Entities have advised Carter Bank that such replacement financing is available and in the final stages of negotiation, Carter Bank has refused to engage in any discussions and in doing so violated special banking regulations prohibiting exclusive lending arrangements.  This pattern of unfair behavior started in September of 2017, was redeployed in September of 2018, July 2019, June 2020, and again in April and May 2021.

11.     Since 2017, when the new management of Carter Bank took over leadership following Worth Carter's passing, Defendants have exploited the strong relationship Governor Justice and the Justice Entities had with Worth Carter – a relationship of open-communication, honesty and trust.  On multiple occasions, Defendants orally promised to give (and repeatedly assured they would give) the Plaintiffs flexibility regarding loan payments and additional minimal financing to allow assets to be prepped for sale, only to delay, obfuscate and then refuse to document such agreements, precipitating technical defaults.

12.     Specifically, in August and September 2017, Defendants induced seven Justice coal-related entities[2] into a technical default on just $1.9 million in amortization payments (representing a mere fraction (less than 1%) of the total outstanding loan balance) by orally

---

[2] These entities include Plaintiff Bellwood Corp. and six additional Justice coal-related entities which as of the date of this Complaint have already paid off all debt previously owed to Carter Bank (Justice Coal of Alabama, LLC, Kentucky Fuel Corporation, Virginia Fuel Corporation, Southern Fuel Corporation, A&G Coal Corporation and Bluestone Energy Sales).

accepting such entities' request in the lead-up to the payment date to forbear and provide additional short-term capital, a commitment which these entities and the other Plaintiffs relied on based on the relationship of trust built over two decades.  But as the final hour approached and Plaintiffs repeatedly sought Defendant Carter Bank's written confirmation of the oral agreement, Defendants intentionally went radio-silent, allowing the payment date to pass, and then immediately sending the Justice Entities not the promised agreement to forbear and extend, but a notice of default and acceleration.

13.    Defendants refused to allow Plaintiffs to cure that technical default and instead accelerated over $268 million of outstanding debt, and used that technical default as leverage over Plaintiffs to obtain extensive amendments to multiple lending documents between Carter Bank and various Justice Entities unrelated to the loan in technical default.  These amendments provided Carter Bank with a substantial package of enforcement rights including new cross-default provisions across all loans between Carter Bank and the Justice Entities, cross-collateralization across unrelated Carter Bank loans, additional guarantees, and broad releases for any and all prior conduct, including the bad faith bait and switch that led to the Fall 2017 technical default and acceleration.  Notably, Carter Bank also required that certain loans, for a total outstanding loan balance of over $268 million, be converted from 20-year notes to various forms of extremely short-term notes.

14.    These demands put Plaintiffs between a rock and a hard place.  Facing an acceleration of over $268 million in debt as a result of the technical default and fearful of alienating its near exclusive financing provider, Plaintiffs had no choice but to acquiesce to the oppressive demands.  Seeing an opportunity to take unilateral action against the Justice Entities in Fall 2017, Carter Bank created a mousetrap around the small September 1 payment, feigned

cooperation, induced a default, and laid the groundwork to continue squeezing the Plaintiffs – all to the Plaintiffs' enormous detriment.

15.     Most recently, and most egregiously, in connection with loan payments due on June 1, 2021 by certain Greenbrier Entities (as defined below), including Oakhurst, (such payments, the "June 1 Payments"), Plaintiffs, over the course of numerous emails and letters to Defendants, have repeatedly attempted to engage in a constructive discussion with respect to the repayment not only of the June 1 Payments but of the entire outstanding loan balances owed by those Greenbrier Entities.  Those efforts have been met with either silence or, even more revealing, responses from Defendants insisting that Plaintiffs must provide another round of broad releases of Defendants as a precondition to *even starting such* discussions and unilaterally leaning on a childish "communication protocol" that Defendant Carter Bank's counsel purports to enforce with the fervor of a middle school hall monitor.  And even communications that comply unquestionably with the protocol have been met with outright refusal to engage in any substantive discussion, even when such discussion is about repaying all the Greenbrier Entities' outstanding loans.

16.     Not only was Defendants' conduct in the period leading up to the June 1, 2021 repayment date in bad faith and in violation of their contractual, statutory and common law duties and obligations, but such conduct also violates the exclusivity prohibition of the Bank Holding Company Act's anti-competitive provisions, which prohibit a bank from restricting a borrower's business with a competitor.  Defendants' stonewalling has jeopardized the replacement financing that the Greenbrier Entities have worked so hard over many months to obtain from a new lender, including outlays of funds, to repay their loans to Carter Bank.

17.     Faced with such bad faith conduct, Plaintiffs have no choice but to bring this

-9-

lawsuit to protect themselves from the ongoing and future harm to their businesses caused by Defendants, caused by Defendant's violations of clear federal prohibitions against imposing exclusivity promises for banking services, and in all events contrary to the obligations of a bank, and the statements by Carter Bank in particular, to engage in good faith and honest dealing with its customers. There should be no confusion – Plaintiffs do not dispute that they received the funds lent by Carter Bank, but also note that Carter Bank's behavior has caused massive damage to the Justice Entities, which will be demonstrated at trial to amount to at least approximately $421 million. Moreover, Plaintiffs respectfully request that the excessive and unfair changes to such loans, the additional security and guarantees obtained by Carter Bank across all Plaintiffs and the releases Carter Bank obtained from the Plaintiffs be declared unenforceable and the relationship between Carter Bank and the Plaintiffs be restored to the *status quo* prior to Carter Bank's breaches of contract and fiduciary duties. Plaintiffs are not seeking unjust enrichment, or enrichment of any sort, but relief and protection from Defendant's inexcusable conduct.

## **PARTIES**

18.     Plaintiff Bellwood Corp. is a West Virginia corporation and is a party to the contracts, agreements and other documentation surrounding the lending relationship between Carter Bank and Plaintiffs (the "Loan Documentation"). Bellwood Corp.'s headquarters is in Beckley, West Virginia and its principal place of business is West Virginia.

19.     Plaintiff Greenbrier Hotel Corp., is a West Virginia corporation and is a party to the Loan Documentation. Greenbrier Hotel Corp.'s headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

20.     Plaintiff Greenbrier Golf and Tennis Club Corp., is a West Virginia corporation and is a party to the Loan Documentation. Greenbrier Golf and Tennis Club Corp.'s

headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

21.     Plaintiff Greenbrier Medical Institute, LLC, is a West Virginia limited liability company and is a party to the Loan Documentation.  Greenbrier Medical Institute LLC's headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

22.     Plaintiff The Greenbrier Sporting Club Development Company, Inc., is a Delaware corporation and is a party to the Loan Documentation.  The Greenbrier Sporting Club Development Company, Inc.'s headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

23.     Plaintiff The Greenbrier Sporting Club, Inc. is a West Virginia corporation and is a party to the Loan Documentation.  The Greenbrier Sporting Club, Inc.'s headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

24.     Plaintiff Justice Family Group, LLC is a Delaware limited liability company and is a party to the Loan Documentation.  Justice Family Group, LLC's headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

25.     Plaintiff James C. Justice Companies, Inc., is a Delaware corporation and is a party to the Loan Documentation.  The James C. Justice Companies, Inc.'s headquarters is in Roanoke, Virginia and it conducts business in West Virginia, Virginia and South Carolina.

26.     Plaintiff Justice Farms of North Carolina, LLC is a Virginia limited liability company and is party to the Loan Documentation.  Justice Farms of North Carolina, LLC's headquarters is in Roanoke, VA, but its principal place of business is South Carolina and West

Virginia.

27.     Plaintiff Justice Low Seam Mining, Inc., is a West Virginia corporation and is a party to the Loan Documentation.  Justice Low Seam Mining, Inc.'s headquarters is in Roanoke, VA and its principal place of business is in West Virginia.

28.     Plaintiff Oakhurst Club, LLC is a West Virginia limited liability company and is a party to the Loan Documentation.  Oakhurst Club, LLC's headquarters is in White Sulphur Springs, West Virginia and its principal place of business is West Virginia.

29.     Plaintiff Tams Management, Inc. is a West Virginia corporation and is a party to the Loan Documentation.  Tams Management, Inc.'s headquarters is in Roanoke, Virginia and its principal place of operations is West Virginia.

30.     Plaintiff Triple J Properties LLC is a Virginia limited liability company and is a party to the Loan Documentation.  Triple J Properties LLC has its principal place of business in Roanoke, Virginia.

31.     Plaintiff Governor Justice is a resident of West Virginia and has a majority ownership in each of the Plaintiffs and is a guarantor under the Justice Entities' loans.  Plaintiff Cathy L. Justice is a resident of West Virginia and a guarantor under the Justice Entities loans. Plaintiff JCJ III is a resident of Virginia, an officer and/or director of each of the Plaintiffs,  a limited guarantor only under a small amount of the Justice Entities loans and is a party to certain of the agreements within the Loan Documentation.

32.     Defendant Carter Bank is a banking institution incorporated in the Commonwealth of Virginia and its principal place of business is also Virginia.

33.     Defendants Michael R. Bird, Kevin S. Bloomfield, Robert M. Bolton, Robert W. Conner, Gregory W. Feldmann, Chester A. Gallimore, Charles E. Hall, James W. Haskins,

Phyllis Q. Karavatakis, Lanny A. Kyle, E. Warren Matthews, Catharine L. Midkiff, Joseph E. Pigg, Litz H. Van Dyke, and Elizabeth Lester Walsh serve as directors of Carter Bank.  Their residencies are currently unknown.

34.     Defendants John and Jane Does are "institution-affiliated parties" (as defined in 12 U.S.C. § 1813) of Carter Bank who participated in the conduct at all relevant times.  Their names and residencies are currently unknown.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. 1331 because Plaintiffs have alleged a violation of 12 U.S.C. § 1972, a federal question, on the face of their complaint.

36.     This Court has jurisdiction over Plaintiffs' related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

37.     Venue is proper in West Virginia, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the events and omissions giving rise to this claim occurred in West Virginia and because a substantial part of the property that is the subject of this action is situated in West Virginia.  The majority of the Justice Entities' operations are in West Virginia for their real estate, mining, land resource and hospitality businesses.

## FACTUAL ALLEGATIONS

### *BACKGROUND OF PLAINTIFFS' BUSINESSES*

38.     Greenbrier Hotel Corp., Greenbrier Golf & Tennis Club Corp., Greenbrier Medical Institute, LLC, The Greenbrier Sporting Club, Inc., Justice Family Group, LLC,

Oakhurst Club, LLC and The Greenbrier Sporting Club Development Company, Inc. (together, the "Greenbrier Entities") are engaged in the business of hospitality.  The Greenbrier Entities service, own and operate Greenbrier Resort located in White Sulphur Springs, West Virginia. The resort includes a golf and tennis facilities, a spa, dining, a casino, as well as a medical clinic and spa.

39.     Tams Management, Inc. and Justice Low Seam Mining Inc. (together, the "Mining Entities") are engaged in the business of mining and processing high quality metallurgical coal principally in the state of West Virginia for use in the production of steel.

40.     Bellwood Corp. is a resource and land company, principally operating in the state of West Virginia.

41.     James C. Justice Companies, Inc. is a real estate holding company, principally operating in the states of West Virginia, South Carolina and Virginia.

42.     Justice Farms of North Carolina, LLC is engaged in the business of farming, particularly grains, corn and soybeans, in both West Virginia and South Carolina.

43.     Triple J Properties LLC is a real estate holding company and commercial lessor.

***WORTH CARTER, GOVERNOR JUSTICE AND THEIR BUSINESSES GROW TOGETHER, ESTABLISH RELATIONSHIP OF TRUST AND RESPECT***

44.     Governor Justice's and Worth Carter's commercial relationship began with an initial real estate loan of approximately $4.5 million in 2001.  In or around 2003, Worth Carter raised with Governor Justice his interest in growing the relationship between the predecessor banks to Carter Bank and exploring long term commercial lending opportunities generally. Worth Carter wanted to build his business with the Justices – he had concluded that loans to the Justice-owned entities would be backed by strong assets, supported by valuable operations,

-14-

secured by desirable collateral and run by people he could trust.  In 2003, the predecessors to
Carter Bank entered into their first coal-related loan to a Justice-owned entity, Dynamic Energy,
Inc., for approximately $12 million.

45.     By 2008, Carter Bank's commercial loan portfolio with the Justice Entities
contained over $70 million in long-term loans across both agricultural and coal mining
operations with loan terms of typically 4-5% interest amortizing over 20 years.  Worth Carter
took an informal and personal approach with the Justice Entities; each note with Carter Bank was
generally two-pages long, and some loans were originated on half-sheets of paper.  Sometimes
he would tell them the lending was approved and shake hands.  Money would then be advanced
and the "details" (lien documentation, loan documentation) would be handled days or weeks
later.

46.     In 2009, the Justice family sold certain coal mining operations and deposited
several hundred million of those sale proceeds at Carter Bank.  These deposits would have
produced approximately over $15 million per year for Carter Bank at a time when Carter Bank's
entire annual net income was just slightly over that amount, according to Carter Bank's year-end
call report filed with regulators.  Shortly thereafter, also in 2009, Governor Justice and the
Justice Family Group, LLC purchased the Greenbrier, a U.S. historic landmark resort in White
Sulphur Springs, West Virginia.  As Governor Justice began to invest in the Greenbrier's
restoration, Worth Carter urged the Justice Family Group, LLC to accept a loan from Carter
Bank in the amount of approximately $50 million to facilitate those efforts so Carter Bank could
retain the coal mining sale proceeds of the Justice family as deposits with Carter Bank and
receive the profit from the difference between the interest rate on the loan and the interest rate on
the deposits.  Again, Worth Carter extended the Justice Entities 4-5% interest rate terms and with

the loan obligations amortizing over 20 years.

47.    In 2011, Governor Justice sought to purchase farmlands in Western Kentucky as well as North and South Carolina.  Rather than using available cash on hand at Carter Bank, Worth Carter suggested that Carter Bank loan the funds to purchase the farmland on favorable terms so Governor Justice could keep family assets liquid to grow his agricultural and coal mining businesses (and Carter Bank could continue to hold the deposits and to receive the profit from the difference in interest rates).  By the end of 2011, Worth Carter secured commercial loan agreements with the Justice Entities totaling over $170 million.

**EXPANSION OF THE CARTER BANK – JUSTICE ENTITIES RELATIONSHIP**

48.    During the 2012-2016 period, there was substantial disruption in the coal industry.  Many coal mining companies were forced to file for bankruptcy, consolidate or liquidate.  The Mining Entities, while less exposed to the terrible thermal coal market, still experienced substantial losses.  During this period, Worth Carter approached the Justices about lending additional funds to the Justice entities, in particular the coal companies, in large part to help keep the Mining Entities out of bankruptcy.  Worth Carter was very clear that Carter Bank would loan additional funds to the Justice Entities to cover operating losses to weather what was hoped to be a temporary decline in the coal industry.

49.    From 2014 through 2015, Carter Bank, at the direction of Worth Carter, provided additional loans to the Mining Entities to fund operating losses and to pay down pre-existing coal loans.  At Worth Carter's suggestion, the Plaintiffs used proceeds from the Carter Bank loans to payoff other short-term lenders to take advantage of the favorable long-term 20-year amortization terms Carter Bank was able to provide.  By the end of 2015, Carter Bank lent over $400 million to the Mining Entities in anticipation of a coal industry rebound with the

-16-

expectation that the loan would be repaid in the future with interest.

**WORTH CARTER PASSES AWAY; CARTER BANK ABANDONS GOOD FAITH RELATIONSHIP**

50.     On April 7, 2017, Worth Carter passed away, leaving in his wake a legacy of close-knit, trust-backed banking relationships.  Van Dyke and Karavatakis formally took over management of Carter Bank.

51.     On or about September 7, 2017, JCJ III and his associates met with Van Dyke, Karavatakis and Carter Bank's attorney to request (i) a loan from Carter Bank for approximately $10 million to bring certain coal mining operations back into production to increase their value for a potential sale and (ii) that the existing $1.9 million payment due on coal loans associated with these entities be deferred for several months to facilitate the sale.  At the meeting, Carter Bank agreed to the proposal and committed to documenting the deal formally in short order.

52.     Between September 7, 2017 and October 1, 2017, Van Dyke, Karavatakis and Defendants' attorneys repeatedly confirmed with JCJ III and lawyers for the Justice Entities that the Justice Entities' September 7th requests were agreed, and in accordance therewith, repeatedly instructed the Justice Entities and their attorneys to not make the corresponding payments for the coal loans because those loans were effectively, for all intents and purposes, extended.  Carter Bank assured the Justice Entities and Justice Family it was just a matter of formalities – something the Justice Entities and Justice Family had come to understand through more than a decade of deals with Carter Bank (the handshake first, documents second was the historical practice of the relationship).  The Justice Entities had no reason to doubt this promise – fifteen years of honor and respect told them that the deal would get done, the loan would be granted and the payments extended.

53.     The Justice Entities and Justice family and its representatives were thus

-17-

bewildered and confused when Carter Bank and its representatives cut off all communication with the Plaintiffs just days before the payments were to come due.  Concerned at the lack of communication, Governor Justice and JCJ III repeatedly contacted Van Dyke, Karavatakis and Carter Bank's attorneys.  The phone calls went unanswered, voicemails were never returned, emails were ignored and pleas for an explanation as to why the repayment extension and $10 million additional loan were not being finalized ahead of the deadline fell on deaf ears.  The mutually beneficial, trust-backed relationship with late Worth Carter in helping the Justice Entities weather tough times was unexpectedly replaced with the cold silence of the new Carter Bank.

54.     On October 3, 2017, the Carter Bank mousetrap snapped. Carter Bank sent the Justice Entities several notices of defaults, accelerating nearly $268 million in what had been 20-year debt obligations, demanding repayment within ten days.

55.     Armed with this "default," concocted by its own deception, Carter Bank refused to give the Justice Entities an opportunity to cure the default.  Instead, the following day, October 4, 2017, Carter Bank sent the Justice Entities a demand requiring that the Justice Entities agree to (i) the inclusion cross-default provisions across some of the Carter Bank/Justice Entities loans, (ii) cross-collateralization across all Carter Bank/Justice Entities loans, (iii) additional guarantees, (iv) acceleration provisions, and (v) delivery of sweeping release and reaffirmation agreements.  Moreover, Carter Bank required that certain loans totally be altered from long-term 20-year notes various forms of extremely short term notes including in some instances demand notes.  In addition, Defendant Carter Bank obtained for itself full access to Plaintiffs' books and records, the right to receive all information with respect to potential alternative financing sources and proposals and the right to a pay down from the proceeds of a sale of assets by Justice-owned

entities which were not obligors, guarantors or pledgors of any Carter Bank debt at such time.

56.     These demands put Plaintiffs between a rock and a hard place.  Facing an acceleration of over $200 million in debt as a result of the technical default and fearful of alienating its near exclusive financing provider, Plaintiffs had no choice but to acquiesce to the oppressive demands.  The entire scope of the two-decade long relationship was fundamentally changed in the matter of a few days, all for failure to pay a $1.9 million loan payment (less than 1%  of the outstanding $269 million in corresponding debt), which failure was precipitated by the deception of Van Dyke and Karavatakis.  Under the severe duress caused by Defendants' tortious, surprising and unfair conduct and with no other option available within such a short time period, the Justice Entities (and the Justices) had no choice but to execute every security pledge, forbearance agreement, guarantee, and release that Carter Bank demanded from them. Carter Bank's deceptive treatment had succeeded – after pulling the rug of trust and confidence right out from under the Justice Entities, they had the ultimate upper hand.

### DEFENDANTS' BAD FAITH CONTINUES

57.     Between November 2017 and May 2021, Defendants demanded and obtained three separate Forbearance Agreements and eleven separate Release and Reaffirmation Agreements from the Justice Entities, which collectively provided Carter Bank with additional cross-collateralization, waiver of cure periods, rights to attorneys' fees, and the inevitable releases.  Every time a new three or six month debt payment due date rolled around, the Justice Entities were forced to renegotiate and comply.  Never once, however, did the Justice Entities miss a payment to Carter Bank other than the single $1.9 million payment in October 2017 which was precipitated by Carter Bank's own tortious actions.

58.     After the tortious scheme that resulted in the initial Forbearance Agreements and

corresponding Release and Reaffirmation Agreement in November 2017, Defendants continued the scheme by following the same pattern of tortious conduct:

- Carter Bank would wait until a note that was converted under duress from a 20-year term to a three month to six month term was coming due.

- Armed with the cross-default, cross-collateralization, guarantees, waivers, and releases obtained through its tortious conduct in October 2017, Defendants would leave a previously agreed-upon loan extension on the now-converted short-term note in abeyance until after the quarter close.

- Instead of facilitating the previously agreed upon loan extension on the converted short-term note at issue, Carter Bank would issue or threaten to issue a default notice and commence foreclosure proceedings across the now cross-collateralized assets unless the Justice Entities agreed to additional improvements including more cross-collateralization, additional guarantees, and the inevitable releases.

59.    For example, in September 2018, Defendant Carter Bank refused to release collateral in connection with a payoff of debt of one of the Justices' coal businesses (Bluestone Resources Inc.) and forced Plaintiffs to pay off other unaffiliated debt at Carter Bank in the amount of approximately $178 million in order to release such collateral.

60.    The following year, Defendants struck again.  One of the Justices' Mining Entities, Justice Low Seam Mining, Inc., had a line of credit with a $4 million balance that was coming due, based on the newly demanded three to six month short-term due dates, on March 31, 2019.  At the time, the coal industry had rebounded to some degree.  Accordingly, in or around March 2019, Governor Justice requested a short-term loan of $10 million from Carter Bank to bring these mining operations into production to prepare them for sale.  He simultaneously requested an extension of the $4 million line of credit that was coming due for the same property.

61.    Carter Bank extended the line of credit until July 31, 2019 and agreed to loan the Justice Entities the $10 million they requested.  However, the deception was soon deployed

-20-

again.

62.     Despite the Justices' repeated attempts to contact Van Dyke and Karavatakis to close the new loan and further extend the line of credit, Carter Bank would not return any of the Justices' calls, emails, or texts.  Finally, on the last business day of July 2019, after both Van Dyke and Karavatakis dodged the Justices' calls throughout the day, and after Van Dyke's secretary confirmed that neither of them intended to return the Justices' calls, the Plaintiffs were left with no choice.

63.     This time the Justice Entities refused to accept Defendants' deceptive practices. Rather than allowing the $4 million line of credit to go into default, which would have triggered all of the cross-default and cross-collateralization obtained by Defendants in Fall 2017, the Plaintiffs paid the $4 million balance and the line of credit was closed.

64.     If it was not already clear that Defendants were dodging the Justices' calls to manufacture a default to further their unfair scheme, it became crystal clear immediately once the Justice Entities thwarted this effort by the Defendants to manufacture another default. Within minutes of payment, Carter Bank's attorney sent the Justice Entities an email indicating he was "putting his pencil down" on the line of credit extension.  After ignoring the Justices' repeated requests all day, suddenly an immediate response arrived.  These were no cases of missed connections – these were bad faith acts by Defendants.

65.     Shortly after this episode of egregious, deceptive behavior, the Defendants began refusing to engage at any level with Plaintiffs unless they adhered to a new "communication protocol", which requires all communication whatsoever to occur only from attorney-to-attorney, only through means of written letters meeting certain criteria.  This protocol, since cancelled by the Justice Entities in an attempt to communicate directly with Carter Bank's board of directors,

was a childish mechanism by which the Defendants hid from their own duties and concealed their unfair behavior.

66.     The following year, Defendants once again engaged in the same bad faith practices that had become their standard operating procedure since 2017.  In or around 2018, Defendants had forced the Justice Entities to convert a $51.7 million loan to James C. Justice Companies, Inc. from a 20-year note to a demand note.

### DEFENDANTS' RECENT BAD FAITH FORCES PLAINTIFFS TO FILE THE COMPLAINT

67.     Defendants' bad faith has also resulted in an improper information asymmetry in favor of Defendants and to the detriment of Plaintiffs.  In or around January 2020, Defendant Carter Bank refused to provide a release to insurance proceeds Greenbrier Hotel Corporation received from a damaging 2016 flood to the property.  When Plaintiff Greenbrier Hotel Corporation asked what basis Defendant Carter Bank was relying in refusing to provide a release, Carter Bank refused to engage with Plaintiffs or to give any explanation for its behavior. Defendant Carter Bank has since continually denied similar such reasonable information requests from Plaintiffs, including, but not limited to, requests for basic portfolio information, such as outstanding loan balances and amounts of payments due.  Egregiously, Defendants have also refused to provide an explanation or reason, despite numerous demands by the Plaintiffs, as to why they have not released collateral in Nelson County, Virginia which was pledged as part of a loan entirely paid off as of June 2018.

68.     The hostility Carter Bank has unfairly directed at Plaintiffs has also jeopardized Plaintiffs' potential business transactions over the course of the past few years, including but not

limited to potential property sales with ready, willing and able buyers.

69.     The most recent iteration of Defendants' bad faith pattern and practice has arisen in connection with five-year maturity loans of certain Greenbrier Entities that come due on June 1, 2021.  Early in 2021, the Greenbrier Entities began exploring potential replacement financing for the Carter Bank debt with a new lender.  As those efforts progressed, the Greenbrier Entities attempted to engage Carter Bank to discuss the repayment of the obligations.  However, consistent with their *modus operandi*, the Defendants have refused to engage at any level, resorting to hiding behind a "communication protocol" which Carter Bank insisted be the only method of communciation between the parties and requires attorneys to contact one another only through means of written letters meeting certain criteria.  And even when written letters are sent according to the protocol, the Defendants refuse to engage on any substantive discussion with the clients.  What's more, this time, Carter Bank asked for a Release and Reaffirmation Agreement to be signed as a *precondition* to merely having discussions, regardless whether a transaction occurs.  Most egregiously, Defendants refused any discussion with Plaintiffs even in the immediate lead-up to the June 1, 2021 repayment date, during which time the Greenbrier Entities informed Carter Bank that they were in the final stages of securing the replacement financing from a new lender for the repayment of all of their Carter Bank loans, putting that replacement financing in jeopardy.

70.     On May 29, 2021, JCJ III sent a final, good faith letter to Defendant Carter Bank's Board of Directors, requesting an emergency meeting in advance of the quickly approaching June 1 Payments, given the stonewalling by Carter Bank, its management, and its counsel throughout the prior months. This good faith letter was also ignored by all Defendants.

71.     The dynamic, trust-based relationship Governor Justice and Worth Carter worked

tirelessly to create over the course of fifteen years has been abandoned and destroyed by

Defendants' deceptive and bad faith conduct since Worth Carter's death in 2017. As such,

Plaintiffs have suffered substantial harm. Plaintiffs now seek to stop this cycle of repeated abuse

of trust and unfair practices with the relief requested of the Court today. Carter Bank is no

longer a "lifetime financial partner", as it proclaims and as it had acted prior to Worth Carter's

death, but a determined, self-proclaimed adversary.

## FIRST CLAIM FOR RELIEF
**(Violation of the Anti-Competitive Behavior Statute 12 U.S.C. § 1972
Against All Defendants)**

72.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if

set forth fully herein.

73.    The Bank Holding Company Act's special provisions designed to prevent anti-

competitive behavior by banking organizations actions include the exclusivity prohibition set

forth in 12 U.S.C. § 1972(1)(E). This prohibits a bank from extending credit on the condition or

requirement that the customer not obtain other credit from a competitor.

74.    Not only has the Fourth Circuit interpreted the anti-tying provisions broadly by

recognizing that their purpose is "to prohibit anti-competitive [banking] practices which require

bank customers to accept or provide some other service or product or refrain from dealing with

other parties in order to obtain the bank product or service that they desire," *Lancianese* v. *Bank

of Mount Hope*, 783 F.2d 467, 469 (4th Cir. 1986) (citing to S.Rep. No. 1084, 91st Cong. 2d

Sess.), at least one district court in this Circuit has specifically found that the exclusivity

prohibition in 12 U.S.C. § 1972(1)(E) applies to restrictions on borrowings from another lender,

*McCune* v. *Nat'l City Bank,* 701 F. Supp. 2d 797, 802 (E.D. Va. 2010). This finding is directly

applicable to Carter Bank's conduct directed towards preventing the Justice Entities' attempts to

refinance existing debt.

75.      Specifically, the court in *McCune* v. *Nat'l City Bank* found that a bank's refusal to entertain a request by an existing borrower for permission to refinance more senior debt was properly subject to review under the Bank Holding Company Act's exclusivity prohibition because: (i) the refinancing represented an "extension of credit," and (ii) as the result of a blanket policy by the second-lien lender prohibiting the subordination of mortgages in favor of modified senior debt, it was, in effect, conditioned on an agreement not to purchase a second product from a competitor.  701 F. Supp. 2d 797, 802 (E.D. Va. 2010).

76.      This holding is consistent with the legislative history of the exclusivity provisions, which, as summarized in a Senate Report, "insures that . . . agreements [related to extensions of credit] may not be tied to or conditioned upon an agreement not to do business with competitors of subsidiaries of the bank holding company, the bank, or of the operators of the bank."  S.Rep. No. 1084, 91st Cong. 2d Sess.

77.      Defendants' refusal to engage in discussions with Plaintiffs with respect to the repayment of the Greenbrier Entities' obligations to Carter Bank in the lead-up to the June 1, 2021 repayment date for certain of those obligations violates the exclusivity prohibitions.  Early in 2021, the Greenbrier Entities began exploring potential replacement financing for their Carter Bank debt with alternative lenders.  As those efforts progressed, the Greenbrier Entities attempted to engage Carter Bank to discuss the repayment of the obligations.  However, consistent with their *modus operandi*, the Defendants have refused to engage at any level, resorting to hiding behind a "communication protocol" which requires attorneys to contact one another only through means of written letters meeting certain criteria.  And even when written letters were sent according to the protocol, the Defendants refused to engage on any substantive

level in discussions to repay the Greenbrier Entities loans. What's more, this time, Carter Bank asked for a Release and Reaffirmation Agreement to be signed as a precondition to merely having discussions, regardless whether a transaction occurs. Most egregiously, Defendants refused any discussion with Plaintiffs even in the immediate lead-up to the June 1, 2021 repayment date, during which time the Greenbrier Entities informed Carter Bank that they were in the final stages of securing the replacement financing from a new lender, putting that replacement financing in jeopardy. Defendant's conduct represents a patent – and illegal—effort to scuttle replacement financing from a new lender.

78.     Carter Bank's efforts to frustrate repayment are primarily motivated by an effort to preserve an interest stream of approximately $15 million per year at Carter Bank, which during the 12 months ended March 31, 2021 reported earnings of only $ 9.9 million. Defendant is liable for damages to be proven at trial, including treble damages under 12 U.S.C. § 197(5).

## SECOND CLAIM FOR RELIEF
### (Breach of Contract under Virginia state law Against Carter Bank)

79.     Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

80.     Plaintiffs and Defendants entered into a series of loans constituting valid contracts and creating a contractual relationship between the parties, and establishing Virginia state law as the law governing such contracts.

81.     Virginia state law recognizes an implied covenant of good faith and fair dealing in every contract. (*Vance* v. *Wells Fargo Bank*, N.A., 291 F. Supp. 3d 769, 774 (W.D. Va. 2018)).

82.     This concept was confirmed by over 15 years of dealing, before Worth Carter's

death, on that basis and by Defendant Carter Bank's own mission statement and advertising.

83.     Defendant Carter Bank breached the covenant of good faith and fair dealing included in each of the contractual lending relationships it entered into with the Plaintiffs since September 2017.

84.     Defendant Carter Bank engaged in a pattern of deceptive and bad faith conduct, including, without limitation, in Fall 2017, inducing the Justice Entities into defaults in order to obtain additional security in the form of cross-defaults and cross-collateralization and guarantees, and to protect themselves through releases from all Justice Entities from any and all prior actions, for which Plaintiffs did not receive adequate consideration.

85.     Defendant Carter Bank has also breached its covenant of good faith and fair dealing over the course of 2021 in refusing to engage in discussions with the Greenbrier Entities with respect to the repayment of the Greenbrier Entities obligations to Defendant, placing the Greenbrier Entities' replacement financing from a new lender in jeopardy.

86.     The breach of the implied duty of good faith and fair dealing by Defendant Carter Bank has directly harmed the Plaintiffs, including but not limited to, business disruption, loss of business reputation, excessive fees and interest, the cost of replacement financing, loss of business opportunity, and attorney and other litigation costs.

### THIRD CLAIM FOR RELIEF
**(Breach of Duty of Care under West Virginia state law Against Carter Bank)**

87.     Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

88.     A substantial majority of the assets of the Justice Entities are located in West

Virginia and two of the Justices are citizens of West Virginia.

89.     West Virginia state law recognizes a claim for breach of duty of care when the parties have a "special relationship" which imparts such a duty of care.  That "special relationship" has been recognized in the context of lender-borrower relationships when the relationship extends beyond the traditional role of a lender to a borrower.

90.     Defendant Carter Bank's conduct created a special relationship with Plaintiffs. Beyond just simply financing loans to the Plaintiffs, Defendant Carter Bank operated as partner to Plaintiffs, was involved in operational decisions and attempted to exercise control over elements of Plaintiffs' business.  Worth Carter worked closely with the Justices and Justice Entities over the course of the more than a decade helping them make decisions regarding capital improvements, acquisitions and divestitures and cash vs. debt financings.  Carter Bank was a self-proclaimed "lifetime" partner of the Justice Entities and a handshake between Carter Bank and the Justice Entities meant more than any piece of paper could because of the strength of the bond and they acted accordingly.

91.     During this time, on information and belief, the Justice Entities became by far the largest clients of Carter Bank, borrowing more money from Carter Bank than any other customer and paying Carter Bank $238.5 million in interest and fees.

92.     Defendant Carter Bank breached the duty of care owed to Plaintiffs when it took advantage of the relationship of trust and expectation of loyalty the Plaintiffs had come to know. Carter Bank induced the Plaintiffs into a manufactured default by providing the Justice Entities with oral assurances of an extension of a de minimus debt repayment only to delay documentation of such extension while preparing to declare a default, accelerate a much larger unrelated debt and require a wholesale recutting of the Carter Bank/Justice Entities lending

relationship.  With the snap of its mouse trap, Defendant flipped the switch on the relationship

with Plaintiffs from confidant and partner to foe and adversary.  Defendant continued to build off

the breach of its care owed to Plaintiffs by then forcing them to acquiesce to dramatically shorter

repayment periods, dramatically worse terms, release and reaffirmations, cross-default

provisions, cross-collateralizations and personal guarantees. Under a series of Forbearance

Agreements and Release and Reaffirmation Agreements that Defendant Carter Bank pressured

Plaintiffs into signing under duress, Defendant Carter Bank obtained for itself full access to

Plaintiffs' books and records, the right to receive all information with respect to potential

alternative financing sources and proposals and the  right to a pay down from the proceeds of a

sale of assets by Justice-owned entities which were not obligors, guarantors or pledgors of any

Carter Bank debt at such time.

93.    Defendant Carter Bank's breach of its duty of care to Plaintiffs under West

Virginia state law has caused significant damage to Plaintiffs including but not limited to,

business disruption, loss of business reputation, excessive fees and interest, the cost of

replacement financing, loss of business opportunity, and attorney and other litigation costs.

94.    Defendant Carter Bank is therefore liable for damages in an amount to be

determined at trial.

## FOURTH CLAIM FOR RELIEF
**(Aiding and Abetting Breach of Duty of Care under West Virginia state law against
Individual Defendants)**

95.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if

set forth fully herein.

96.    A substantial majority of the assets of the Justice Entities are located in West

Virginia and two of the Justices are citizens of West Virginia.

97.     The Individual Defendants aided and abetted the breach of the duty of care by Defendant Carter Bank by knowingly participating in the breaches of duty.

98.     Individual Defendants' breach of their duty of care under West Virginia state law to Plaintiffs has caused significant damage to Plaintiffs including but not limited to, business disruption, loss of business reputation, excessive fees and interest, the cost of replacement financing, loss of business opportunity, and attorney and other litigation costs.

99.     Individual Defendants are therefore liable for damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty under Virginia state law Against Carter Bank)**

100.     Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

101.     Under Virginia state law, a "fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Ltd. P'ship* v. *Wimmer,* 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979).  The relationship between Plaintiffs and Carter Bank was one of special confidence that goes beyond a standard banking relationship. For over 15 years prior to Worth Carter's passing in 2017, Plaintiffs and Carter Bank had a relationship built on honor and trust.  Plaintiffs frequently consulted Defendant Carter Bank before making business decisions, and Worth Carter frequently initiated business arrangements. When Plaintiffs sought to purchase farmlands in 2011, Carter Bank persuaded Plaintiffs to purchase using Carter Bank loans instead of cash on hand.  When Plaintiffs' coal mining

business struggled in an underperforming coal market in 2012, Carter Bank encouraged Plaintiffs not to sell their coal mining business and instead to take more loans from Carter Bank.  Deals between Plaintiffs and Defendants were routinely made on handshakes, a practice only made possible through "special confidence" that Plaintiffs had placed in Defendants.

102.    Defendant willfully and intentionally breached the duty of care and loyalty owed to Plaintiffs when it took advantage of the relationship of trust and expectation of loyalty Plaintiffs had come to know.  Defendant Carter Bank induced Plaintiffs into a manufactured default through its calculated and dishonest ploy in 2017.

103.    In the years following 2017, Defendant Carter Bank continued to build off this breach of care and loyalty owed to Plaintiffs by forcing them to sign onto dramatically shorter repayment periods, dramatically worse terms, cross-collateralizations, cross-defaults, blanket releases and guarantees.  Under a series of Forbearance Agreements and Release and Reaffirmation Agreements that Defendant Carter Bank pressured Plaintiffs into signing under duress, Defendant Carter Bank obtained for itself full access to Plaintiffs' books and records, the right to receive all information with respect to potential alternative financing sources and proposals and the  right to a pay down from the proceeds of a sale of assets by Justice-owned entities which were not obligors, guarantors or pledgors of any Carter Bank debt at such time.

104.    In 2021, Defendant Carter Bank continued to breach the duty of care and loyalty owed to Plaintiffs in refusing to engage with Plaintiffs regarding the repayment of all of the Greenbrier Entities' obligations to Carter Bank.

105.    Defendant Carter Bank's breach of the duty of care and loyalty under Virginia state law owed to Plaintiffs has caused significant damages to Plaintiffs including but not limited to, business disruption, loss of business reputation, excessive fees and interest, the cost of

replacement financing, loss of business opportunity, and attorney and other litigation costs.

106.    Defendant Carter Bank is therefore liable for damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty under Virginia state law Against Individual Defendants)

107.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

108.    Individual Defendants aided and abetted the breach of the fiduciary duty by Defendant Carter Bank by knowingly participating in the breaches of duty.

109.    Individual Defendants' breach of their fiduciary duty under Virginia state law to Plaintiffs has caused significant damage to Plaintiff including but not limited to, business disruption, loss of business reputation, excessive fees and interest, the cost of replacement financing, loss of business opportunity, and attorney and other litigation costs.

110.    Individual Defendants are therefore liable for damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Declaratory Judgment)

111.    Plaintiffs re-allege and incorporate herein by reference all prior paragraphs as if fully set forth herein.

112.    Plaintiffs request declaratory relief pursuant to 28 U.S.C. 2201 and W.Va. Code § 55-13-1, which grants courts the power  "to declare rights, status and other legal relations whether or not further relief is or could be claimed" and notes that "no action or proceeding shall

-32-

be open to objection on the ground that a declaratory judgment or decree is prayed for."

113.    Defendant Carter Bank had Plaintiffs execute, as part of their loan documents, agreements that it may use a "confession of judgment" in the event of default.

114.    The "confessions of judgment" violate due process in that they allow Defendant to obtain judgment against Plaintiffs without adequate opportunity of Plaintiffs to present their valid defenses and should be considered void as against public policy.

115.    The Justice Entities are entitled further to a declaration that each and every Release and Reaffirmation Agreement and/or Forbearance Agreement is unenforceable as against them, for want of consideration.

116.    Additional agreements agreed to by the Justice Entities in the period since September 2017 are also unenforceable because they were obtained under deceptive terms and unfair practices.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that the Court enter judgment against Defendants and in favor of Plaintiffs for the following relief:

a)  A declaratory judgment in its favor;

b)  Direct and consequential damages of not less than approximately $421 million (including trebling under 12 U.S.C. § 197(5);

c)  Punitive damages as allowed by law;

d)  Costs, interest, expenses, and attorneys' fees;

e)  Pre-judgment and post-judgment interest on the Plaintiffs' damages as allowed by law;

f)   Such other and further relief as the Court deems just and proper.

Dated:  May 31, 2021
        Beckley, WV

Respectfully submitted,


*/s/Christopher Schroeck*

_____
Christopher Schroeck (WVSB 13686)
Bluestone Resources, Inc.
302 S. Jefferson St.
Roanoke, Virginia 24011
Telephone:      (540) 492-4080, x211
Cellular:       (540) 986-5354
 Email:         Chris.schroeck@bluestone-
                coal.com

-and-

**SULLIVAN & CROMWELL LLP**
H. Rodgin Cohen (WVSB 767)
James L. Bromley (*pro hac vice* to
be filed)
Benjamin S. Beller (*pro hac vice* to
be filed)
125 Broad Street
New York, New York  10004
Telephone:      (212) 558-4000
Facsimile:      (212) 558-3588
Email:          cohenhr@sullcrom.com
                bromleyj@sullcrom.com
                bellerb@sullcrom.com


*Counsel to the Plaintiffs*