**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION**

_____ x
                                       :
BELLWOOD CORP., *et al.*               :          Civil Action No. 5:21-cv-00320
                                       :          Honorable Frank W. Volk, Judge
                                       :
*Plaintiffs.*                          :
                                       :
v.                                     :
                                       :
CARTER BANK & TRUST, *et al.*          :
                                       :
                                       :
*Defendants.*                          :
                                       x

**PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO FRCP 12(B)(2) AND (3)**

Seeking to evade Plaintiffs' chosen forum, Defendant Carter Bank & Trust ("Carter Bank")

has moved to dismiss or transfer on venue grounds, and the Director Defendants[1] have moved to

dismiss based on personal jurisdiction.[2]  In support hereof, Plaintiffs rely on the Declaration of

James L. Bromley (the "Bromley Decl.") and the Declaration of James C. Justice III (the "Justice

III Decl.") filed contemporaneously herewith.  For the reasons set forth herein, the Motions to

Dismiss should be denied.

*First*, venue: Carter Bank does not seriously dispute that this district is a proper venue for

this action.  Rather, it points only to forum-selection clauses found in the very Loan Documentation

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Complaint [Dkt. No. 1].

[2] On July 14, 2021, Defendants filed two separate motions to dismiss, one by Carter Bank on grounds of improper venue [Dkt. No. 49] (together with the memorandum in support, the "Venue Motion") and a separate motion by the Director Defendants on grounds of lack of personal jurisdiction [Dkt. No. 51] (together with the memorandum in support, the "Jurisdiction Motion", and together with the Venue Motion, the "Motions to Dismiss").  In the interests of administrative efficiency, and given the overlapping issues, Plaintiffs hereby submit a single consolidated opposition to both Motions to Dismiss (the "Opposition").

whose *invalidity* is, in part, the subject of this litigation.  The Complaint alleges with particularity the overreach and deception that renders those agreements—including their forum-selection clauses—void.  Defendants cannot now further exploit their wrongful conduct to defeat Plaintiffs' choice of forum.  *See M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *accord Allen* v. *Lloyds of London*, 94 F.3d 923, 928 (4th Cir. 1996).

Even if the forum-selection clauses were valid, however, they would not govern the lead count in the Complaint: Defendants' violation of the Bank Holding Company Act (such claim, the "BHCA Claim").  That count—which is statutory in nature, not contractual—arises not from any loan agreement but rather from Defendants' efforts to impede the Justice Entities' relationships with *other lenders*.  Forum-selection clauses in the Loan Documentation have no bearing on that claim.  And precedent and judicial economy holds that if the BHCA Claim must remain in this district, the remaining counts should as well.

*Second*, personal jurisdiction: there is no dispute that Carter Bank itself is subject to this Court's jurisdiction.  It conspicuously did not join the personal jurisdiction motion, for obvious reasons:  it has lent hundreds of millions of dollars to companies based or operating principally in West Virginia, enjoyed hundreds of millions of dollars in interest and fees from those loans, and filed liens in West Virginia on the collateral for those loans, among other acts directed at this district—conduct that indisputably subjects it to jurisdiction here.[3] Yet the executive officers and directors who oversaw and directed *those very actions* seek somehow to skirt the Court's jurisdiction.  Carter Bank, though, is not a natural person; it acts only through its officers and directors, and no great leap is needed to infer that the actions that create jurisdiction over the bank

---

[3] Carter Bank's exposure to Plaintiffs today is almost 100% of its equity capital and has been even higher in the past. In addition, if Carter Bank's loans to Plaintiffs were placed on nonperforming status, its nonperforming loans would increase by 58 times and its nonperforming assets would increase by 13 times. The annual interest paid by Plaintiffs to Carter Bank also historically constitutes a significant percentage of Carter Bank's income.

were *caused* by the people who run the bank.  Indeed, that is the only possible inference.  To the extent any question remains, Mr. Justice III's Declaration confirms that the Director Defendants regularly took specific actions directed at this district.

A plaintiff's choice of forum should be accorded great weight and is not to be rejected merely because defendants would prefer another court.  The Complaint and this Opposition provide the Court an ample basis to enforce that fundamental principle and deny the Motions to Dismiss.  But if the Court perceives that questions remain, Plaintiffs are entitled to limited discovery on jurisdiction and venue—or, at minimum, an evidentiary hearing on the pertinent factual questions—before their right to choose their own forum is upended.[4]

## ARGUMENT

## I.  THIS COURT IS A PROPER VENUE AND SHOULD KEEP THIS ACTION IN THIS FORUM

### A.  This Court is a Proper Venue Because a Substantial Part of the Events or Omissions Giving Rise to Plaintiffs' Action Occurred in West Virginia

Absent an evidentiary hearing, a plaintiff need only make a *prima facie* showing of venue to defeat a motion alleging improper venue.  *Mitrano* v. *Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). The federal venue statute provides venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated."[5]  28 U.S.C. § 1391(b)(2).  In determining whether events or

---

[4] As the Court is aware, on July 27, 2021, Plaintiffs filed an expedited motion for limited discovery into the issues raised by the Motions to Dismiss [Dkt. No. 53], which Defendants opposed.  The Court has not ruled on Plaintiffs' motion as of the date of the Opposition.  Plaintiffs maintain that limited discovery is appropriate under the circumstances and, in the event that such discovery is granted, reserve the right to seek permission to file a supplemental opposition to the Motions to Dismiss with the benefit of such discovery.

[5] Plaintiffs note that the Venue Motion does not contain the word "substantial" despite the importance of that term to the venue test under 28 U.S.C. § 1391 and in fact only refers to 28 U.S.C. § 1391 twice (at 16)—in both cases, in connection with Carter Bank's argument that Virginia is a proper venue for this action.  Although Plaintiffs could have brought this action in Virginia federal court, the fact that Virginia is also a proper venue does nothing to change that West Virginia is a proper venue under 28 U.S.C. § 1391, and Carter Bank's argument for venue transfer that Virginia is a more appropriate venue is unavailing for the reasons set forth herein.

omissions are sufficiently substantial to support venue, a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Rather, it should review the entire sequence of events underlying the claim. *Mitrano*, 377 F.3d at 405. The "substantial part of the events" requirement is a low bar. *See Bates* v. *C&S Adjusters*, 980 F.2d 865, 868 (2d Cir. 1992) (finding plaintiff's opening a letter in New York to be sufficient for venue purposes).

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in the Complaint occurred in West Virginia.[6] The majority of the Plaintiffs (13 out of 17) are West Virginia corporations, limited liability companies, residents (including the Governor of West Virginia) or have principal place of business in West Virginia.[7] The Justice Entities employ numerous West Virginia residents whose employment is put at risk by Defendants' misconduct. The Greenbrier Entities service, own and operate The Greenbrier Resort—collateral to certain debt obligations—which is located in White Sulphur Springs, West Virginia and is the largest hospitality business in the State of West Virginia. Plaintiffs Tams Management, Inc. and Justice Low Seam Mining Inc. are engaged in the business of mining and processing high quality metallurgical coal principally in the state of West Virginia and such assets serve as collateral under certain debt obligations. At least one in-person meeting between two of the Director Defendants, Mr. Van Dyke and Ms. Karavatakis, in their capacities as directors and officers of Carter Bank and representatives of Plaintiffs took place in the Southern District of West Virginia. (*Infra* at 16–17.) Carter Bank, as managed and controlled by its

---

[6] In the event that the Court grants the Jurisdiction Motion, venue in this Court is proper with respect to Carter Bank for the additional reason that Carter Bank is a resident of this district pursuant to § 1391(c)(2) because it is subject to jurisdiction through its contacts with the Southern District of West Virginia, which Carter Bank does not dispute, and venue is proper in a judicial district "in which any defendant resides, if all defendants are residents of the State in which the district is located" 28 U.S.C. § 1391(b)(1).

[7] As set forth in the Complaint ¶¶ 18–31, eight Justice Entities are West Virginia corporations or limited liability companies, three Justice Entities have their principal place of business in West Virginia, and Plaintiffs James C. Justice II and Cathy L. Justice are residents of West Virginia.

executives and board of directors, knowingly and intentionally engaged in substantial lending activity, including, without limitation, (a) filing UCC financing statements and mortgage recording statements in connection with such collateral and (b) causing letters to be sent to Plaintiffs, including to certain Plaintiffs' West Virginia addresses, in connection with the underlying banking relationship.  (Bromley Decl. ¶¶ 2–5, Ex. 1–4.)  Therefore, a substantial part of the events or omissions giving rise to the claims in the Complaint occurred in the Southern District of West Virginia.  Carter Bank's suggestion that the action is not "local to West Virginia" ignores the overwhelming connection that this action has to this forum and should be soundly rejected.  (Venue Mot. at 4.)

Carter Bank's assertion (*see* Venue Mot. at 3) that a different result is dictated because five of the 17 Plaintiffs are headquartered in Virginia and three out of the seven claims arise under Virginia law (notably, the same number of claims were asserted under West Virginia law) is entirely inapposite.  That Virginia may be another proper forum for this action, and that *Plaintiffs* could have reasonably expected to appear in Virginia court, has no bearing on whether West Virginia is a proper forum under § 1391.  The question—in litigation initiated by Plaintiffs—is whether *Carter Bank* (and, to some extent, the Director Defendants, although notably the Director Defendants did not move for dismissal or transfer for venue) could have reasonably expected to defend itself in the Southern District of West Virginia.  There is no reasonable basis for Carter Bank to suggest it did not have such an expectation: Carter Bank has engaged in a banking relationship with the Justices for nearly two decades, knew that many of its borrowers are West Virginia companies, and filed UCC financing statements and mortgage recording documents in West Virginia.  That is why Carter Bank does not in fact argue that this Court is an improper venue for this action.  Rather, Carter Bank argues that the forum-selection clauses included in certain of

the Loan Documentation (i) cover all Plaintiffs' claims, including non-contractual claims, and (ii) should supersede Plaintiffs' and West Virginia's interests in having this dispute litigated in West Virginia courts.  For the reasons discussed below, that argument fails.

## B.  The forum selection clauses are invalid

It is long established, as a general proposition, that forum selection clauses are invalid and unenforceable "for such reasons as fraud or overreaching."  *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *accord Allen* v. *Lloyds of London*, 94 F.3d 923, 928 (4th Cir. 1996) ("Choice of forum and law provisions may be found unreasonable if," among other things, "their formation was induced by fraud or overreaching" or if they otherwise result in fundamental unfairness or contravene a sufficiently important public policy of the forum state (citing *Carnival Cruise Lines, Inc.* v. *Shute*, 499 U.S. 585, 595 (1991))); *cf. Schaff* v. *Sun Line Cruises, Inc.*, 999 F. Supp. 924, 927 (S.D. Tex. 1998) (refusing to enforce cruise ticket provision that disputes be brought before the courts of Athens, Greece, as "fundamentally unfair" where Texas plaintiff had to accept ticket terms else forfeit $1,770.00 fare).  At bottom, then, forum selection clauses must be ***reasonable*** to be valid.  The parties' ostensible choice of forum need not be enforced if it is shown to be "unreasonable or was imposed by fraud or unequal bargaining power."  *Vulcan Chem. Tech., Inc.* v. *Barker*, 297 F.3d 332, 339 (4th Cir. 2002).

*Dove Air, Inc.* v. *Bennett*, 226 F. Supp. 2d 771 (W.D.N.C. 2002), applying Fourth Circuit law, illustrates the point.  The district court in *Dove Air* declined to enforce a forum selection clause stemming from a joint venture for the sale of aircraft where the plaintiff was forced to accept the agreement because of his "severe financial problems."  *Id.* at 774.  Upon examining the contract as a whole, the court concluded that its language "supports Plaintiffs' arguments of overreaching."  *Id.* at 775 (detailing lack of reciprocity throughout joint venture agreement).  The court acknowledged the plaintiffs' allegations of his "desperate financial condition," accepting them as

true for purposes of the analysis and buttressed by "the provisions of the agreement itself," which together revealed "unequal bargaining power and overreaching." *Id.* Significantly, and of similar application to the case at bar, the court noted that "it appears there was no bargaining at all, but merely the presentation to [the plaintiff] of the agreement which he had to sign in order to do business with [the defendant]." *Id.*

The Complaint here is replete with nonconclusory and plausible assertions that Carter Bank had Plaintiffs over the proverbial financial barrel. To name just a few, Plaintiffs allege, *inter alia*, that Defendants used their leverage from forcing the initial technical default "to demand additional protection and security in the form of previously unavailable cross-default provisions in multiple loan agreements" (Cmplt. ¶ 9),  then "accelerated over $268 million of outstanding debt" (*id.* ¶ 13), which "put Plaintiffs between a rock and hard place" (*id.* ¶ 14), for which they had scant recourse after Defendants obtained broad releases for inadequate consideration "to rubber stamp their overreaching tactics" (*id.* ¶ 9).

***All*** of the more than 75 loan documents submitted by Defendants in support of  Plaintiffs' contractual consent to a Virginia forum, save ***three***, were executed after the first alleged campaign of oppression by Defendants in Fall 2017. (*See* Venue Mot. Ex. 1 (summary of exhibits in support of Venue Motion).)  The first two outliers, the January 12, 2017 Loan Agreement (*see* Ex. 1.A to Venue Mot.) and May 22, 2017 Loan Agreement (*see* Ex. 1.B to Venue Mot.), are no longer operative agreements:  the loans under the January 1, 2017 Loan Agreement, in the amount of $5 million out of the entire loan package totaling nearly $400 million (as of today), matured and terminated in June 2017, and the May 22, 2017 Loan Agreement, an $8 million loan, was refinanced and closed shortly after its inception. (Justice III Decl. ¶ 2.)  With the underlying Loan Agreement having long ago been terminated or refinanced, its forum-selection clause is

inoperative and has no bearing here.  The third outlier is a Release and Reaffirmation Agreement, dated May 22, 2017 (*see* Venue Mot. at 9, Ex. 1.N to Venue Mot.)  The forum-selection clause in that agreement only governs "any legal action or proceeding arising out of or relating to **this Agreement.**"  (Ex. 1.N to Venue Mot. ¶ 7 (emphasis added)): since that agreement governs only pre-May 22, 2017 matters between the applicable parties, and the Complaint alleges misconduct subsequent to the entry into such agreement, that forum-selection clause similarly is inoperative with respect to this action.

As for the remaining agreements comprising the Loan Documentation subsequent to Fall 2017, the Court can surely appreciate the injustice that would follow if it were to override Plaintiffs' choice of forum in favor of contrary provisions contained in documents whose essential validity is, in part, the subject of the litigation and is in dispute.  It is fair to expect that, among the consequences flowing from such a ruling, one would be to encourage bad behavior on the part of lenders by permitting them to secure their preferred forum through overreaching and duress.

The Court would likely be reluctant, and rightly so, to lend its imprimatur to that sort of perverse incentive, particularly without affording Plaintiffs discovery and an evidentiary hearing to give teeth to the Complaint's allegations in the face of the contested issues of material fact raised by Defendants' Venue Motion.

### C.  The Forum Selection Clauses, Even If Enforceable, Do Not Cover Plaintiffs' Statutory Claim, and Plaintiffs' Choice of Forum Should Be Accorded Great Weight

Plaintiffs' Complaint alleges both contractual and non-contractual claims, including a statutory claim under federal law designed to prevent anti-competitive behavior by banking organizations.[8]  While certain of the agreements constituting the Loan Documentation contain a

---

[8] *See generally* Cmplt. ¶¶ 72–116; Cmplt. ¶72–78.

forum-selection clause, the language in those clauses varies across agreements. Certain agreements provide that "any legal action or proceeding arising out of or relating to" the agreement must be brought in the Virginia state or federal courts;[9] other agreements simply provide that Virginia will be the forum, venue and place of jurisdiction "[i]n the event of a dispute."[10] In either case, the forum-selection clauses in the Loan Documentation, to the extent binding at all, do not restrict the forum in which Plaintiffs may bring their BHCA Claim against the Defendants. Courts in the Fourth Circuit evaluating the scope of a forum-selection clause interpret its language to determine whether parties intended the applicable claim to be covered.[11] *See Sharpe* v. *Ally Fin., Inc.*, 2017 WL 5078900, at *3 (W.D.N.C. Nov. 3, 2017).

Here, forum-selection clauses in the Loan Documentation do not cover Plaintiffs' BHCA Claim: the BHCA Claim alleges anti-competitive interference by Defendants with Plaintiffs' negotiation efforts and relationship with a third-party potential financing source, a relationship wholly distinct from the relationship between Carter Bank and Plaintiffs, and one which does not arise from or relate to the Loan Documentation. *See Pacheco* v. *St. Luke's Emergency Assocs., P.C.*, 879 F. Supp. 2d 136, 141–42 (D. Mass. 2012) (holding that statutory claim under Fair Labor Standards Act was based on independent statutory rights and thus was not a "dispute derived out of" the employment agreement pursuant to forum-selection clause).[12] Moreover, any possible connection that such third-party relationship has to Carter Bank or the Loan Documentation is *the*

---

[9] *See* Ex. 1.A to Venue Mot.

[10] *See* Promissory Note at Ex. 1.B to Venue Mot.

[11] In interpreting a contract, courts look to parties' "objective manifestations of intent," which is typically the plain language of the contract. *Silicon Image, Inc.* v. *Genesis Microchip, Inc.*, 271 F. Supp. 2d 840, 850 (E.D. Va. 2003).

[12] *See also Crouch* v. *Guardian Angel Nursing, Inc.*, No. 07-CV-00541, 2009 WL 3738095, at *2-3 (M.D. Tenn. Nov. 4, 2009) (plaintiff's claim under FLSA was not effort to enforce any provision of the agreement and thus was not an "action to enforce any provision of this agreement" pursuant to the forum-selection clause). *Cf. Card Isle Corp.* v. *Farid*, No. 7:20-CV-00708, 2021 WL 1856846, at *2 (W.D. Va. May 10, 2021) (holding forum-selection clause covered statutory claims stemming from contract parties' business relationship where clause covered claims "otherwise arising as a result of [the parties'] relationship").

*result of Defendants' own misconduct.*  Carter Bank cannot leverage that misconduct to subject the BHCA Claim to a forum-selection clause in the Loan Documentation.  To read the forum-selection clauses so broadly as to cover the BHCA Claim would be inconsistent with what the parties could reasonably have intended.

Because Plaintiffs are entitled to bring, at least, their BHCA Claim in this Court, requiring Plaintiffs to bring their contractual claims in a Virginia court because of the forum-selection clauses would result in inefficient parallel litigation involving substantially the same claims and facts being tried in separate courts.  Moreover, a plaintiff's choice of forum is accorded great weight by courts in this district,[13] and this Court has a substantial interest in adjudicating the dispute, and therefore all Plaintiffs' claims should be heard by this Court.

In addition, courts generally construe generic forum-selection clauses like those in the Loan Documentation narrowly.  *See, e.g.*, *Phillips* v. *Active Audio Ltd*, 494 F.3d 378, 390–91 (2d Cir. 2007) (ruling that copyright claim did not arise out of contract and therefore was not covered by forum-selection clause); *Hansa Consult of N. Am., LLC* v. *Hansaconsult Ingenieurgesellschaft mbH*, 35 A.3d 587, 593–94 (N.H. 2011) ("[A]pplying a contractual forum selection provision . . . outside the scope of the contract would upset the legitimate expectations of the contracting parties . . . .").[14]

Courts have also refused to enforce forum-selection clauses if enforcement would result in parallel litigation involving similar claims or issues.  *See, e.g.*, *F.L. Crane & Sons, Inc.* v. *Malouf Constr. Corp.*, 953 So.2d 366, 373 (Ala. 2006) (holding that forum-selection clause should not be

---

[13] *Smith* v. *JP Morgan Chase Bank, N.A.*, 727 F. Supp. 2d 476, 481 (S.D.W. Va. 2010); *see also Ferrell* v. *Grange Ins.*, 354 F. Supp. 2d 675, 680 (S.D.W. Va. 2005) ("[A] district court generally accords the plaintiff's choice of forum considerable weight.").

[14] The forum-selection clauses in the Loan Documentation that dictate a forum "[i]n the event of a dispute" (*supra* note 10) are precisely the type of generic forum-selection clauses that should be read narrowly and limited to contractual claims, and, in any event, no broader than the "arising out of or relating to" language (*supra* note 9).

enforced if its enforcement would result in two lawsuits involving similar claims being tried in separate courts); *Personalized Mktg. Serv., Inc.* v. *Stotler & Co.*, 447 N.W.2d 447, 451–52 (Minn. Ct. App. 1989).  In so holding, courts have pointed to the danger of inconsistent adjudications and have cited to efforts to conserve judicial resources.[15]  Courts in this district have also found that bifurcating non-contractual claims and contractual claims impedes judicial economy.[16]

Because Plaintiffs' BHCA Claim in the Complaint is not subject to the forum-selection clauses, judicial economy and deference to Plaintiffs' choice of venue militate against enforcement of the forum-selection clauses to transfer this action to a Virginia court.

### D.  The Balancing Test for Venue Transfer Weighs in Favor of the Southern District of West Virginia

When considering transfer of venue under 28 U.S.C. § 1404(a), courts in the Fourth Circuit weigh several factors, including:

> (1) ease of access to sources of proof; (2) the convenience of parties and witnesses; (3) the cost of obtaining the attendance of witnesses; (4) the availability of compulsory process; (5) the possibility of a [jury] view [of a physical location]; (6) the interest in having local controversies decided at home; and (7) the interests of justice.[17]

Here, factors (1), (3) and (4) do not weigh heavily on either side:  with respect to factor (1), most, if not all, of the documents are available electronically, and thus it is equally convenient to access the relevant documents in either the Southern District of West Virginia or the Western District of Virginia.  Factors (3) and (4) are neutral because witnesses are located in both West Virginia and Virginia, and both actions would be governed by the Federal Rules of Civil Procedure.  Factor (5) is likely inapplicable in this action given the nature of the dispute.

---

[15] *See, e.g.*, *Scott* v. *Tutor Time Child Care Sys. Inc.*, 33 S.W.3d 679, 683 (Mo. Ct. App. 2000) ("To avoid duplication of effort, and to avoid potential problems of collateral estoppel or res judicata or inconsistent adjudications which could theoretically result from separating the trials of these related claims, it makes sense to keep all the litigation here and it is unreasonable to do otherwise.").

[16] *See, e.g.*, *6515 MacCorkle LLC* v. *Evanston Ins. Co.*, 2020 U.S. Dist. LEXIS 180642, *7–8 (S.D.W. Va. 2020).

[17] *Alpha Welding and Fabricating, Inc.* v. *Todd Heller, Inc.*, 837 F. Supp. 172, 175 (S.D.W. Va. 1993).

Factors (2), (6) and (7), however, weigh strongly in favor of the Southern District of West Virginia.  First, although Carter Bank erroneously contends that the controversy is centered in the Western District of Virginia because that is where Carter Bank is headquartered (*see* Venue Mot. at 19), the core of this dispute centers around actions and omissions by Carter Bank and its directors and executive officers in or directly involving West Virginia, as described in detail above.  The majority of the Plaintiffs are West Virginia residents, including those that employ large numbers of West Virginia residents, and a substantial portion of the collateral underlying the debt obligations is located in West Virginia.  As a result, West Virginia residents will be most affected by the controversy and it is therefore West Virginia courts that should decide the dispute.  The State of Virginia has at most a passing interest in the outcome of this dispute.

In addition, certain of Plaintiffs and their witnesses are located in West Virginia, including the Governor of West Virginia who has compelling reasons to avoid travelling out of state unnecessarily (as well as serious scheduling challenges) to ensure performance of his executive duties.  Courts in this jurisdiction have held that where parties are "less than a one-day drive from" the forum court, the inconvenience of travelling to the forum in ordinary circumstances is insufficient to tip the balancing test.  *Alpha Welding*, 837 F. Supp. at 174.  Therefore, any inconvenience to Carter Bank (headquartered in Martinsville, Virginia, approximately 2.5 hours by car from this Court), and any other Defendant that can drive to this Court is *de minimis*.  But that is not the case for the Governor of West Virginia.  Therefore, no material burden is created by requiring the Defendants to travel to this Court, and especially no burden, if any, outweighs the burden created by requiring the Governor of West Virginia to travel out of state.

Weighing all factors, the Court should keep this action in this forum, and thus Carter Bank's Venue Motion should be denied with prejudice.

4845-4783-2052 v.5

## II.   THE COURT HAS JURISDICTION OVER THE DIRECTOR DEFENDANTS

The parties agree that (i) personal jurisdiction over the Defendants (who are nonresidents

of West Virginia) in this case is determined by application of West Virginia's long-arm statute,[18]

and (ii) West Virginia's long-arm statute extends to the limit of the due process clause of the U.S.

Constitution.[19]   When a court decides a pretrial personal jurisdiction motion without conducting

an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction.

*See Lane* v. *Boston Sci. Corp.*, 481 S.E.2d 753, 758 (W. Va. 1996).[20]   In undertaking that review,

"the court must view allegations in the pleadings in the light most favorable to the plaintiffs" and

draw all reasonable inferences in favor of plaintiffs.[21]   *Id.*; *Koro*, 773 F.3d at 560.

To establish personal jurisdiction over a defendant under West Virginia's long-arm statute,

plaintiffs need only establish that a defendant had "sufficient minimum contacts with the forum

state such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice."[22]   In determining defendants' minimum contacts with the forum state, courts

in the Fourth Circuit consider three factors:

> (1) the extent to which the defendant purposefully availed itself of the privilege of
> conducting activities in the State; (2) whether the plaintiffs' claims arise out of
> those activities directed at the State; and (3) whether the exercise of personal

---

[18] The West Virginia long-arm statute, W. Va. Code § 56-3-33, expressly provides, *inter alia*, that the exercise of personal jurisdiction is proper over a defendant "transacting any business" in West Virginia, causing "tortious injury by an act or omission" in West Virginia, or causing tortious injury in West Virginia by an act or omission outside of West Virginia.

[19] *See* Jur. Mot. at 9–10.

[20] In the context of an evidentiary hearing on the personal jurisdiction issues, the standard of proof would be a preponderance of the evidence.  *Lane*, 481 S.E.2d at 758.

[21] The Jurisdiction Motion acknowledges that the court must draw all reasonable inferences in favor of Plaintiffs, at 7, but nevertheless erroneously insists that Plaintiffs must make specific factual allegations in the Complaint of specific actions by the Director Defendants to establish jurisdiction.  (Jur. Mot. at 12–15.)  The Supreme Court's decisions in *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007) and *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) have replaced any requirement of specific allegations in a complaint with a nonconclusory-and-plausible pleading standard.  Accordingly, Plaintiffs do not have the burden to plead specific factual allegations in the Complaint but to allege facts from which reasonable inferences can be drawn to establish a *prima facie* case for jurisdiction.

[22] *Clarke Veneers & Plywood, Inc.* v. *Mentakab Veneer & Plywood*, 821 Fed. Appx. 243, 244 (4th Cir. 2020) (quoting *Consulting Eng'rs. Corp.* v. *Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009)).

jurisdiction would be constitutionally reasonable.

*Id*.  There is no need for the defendant to physically enter the forum state; mail or electronic communications are sufficient.  *Burger King*, 471 U.S. at 476.  Further, "even a single act can support jurisdiction." *Id.* at 475 n. 18.  Notably, consistent with the Supreme Court's recent decision in *Ford Motor* plaintiffs need not establish a causal connection between defendants' contacts with the forum state and their claim.[23]  In holding that Ford Motor had minimum contacts with the forum states and was subject to jurisdiction there, the Supreme Court pointed to the business that Ford Motor regularly conducted in the forum state.  *Id*. at 1028.  The Supreme Court's holding in *Ford Motor* is not novel and is, in all events, binding.

### A. The Director Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in West Virginia

Drawing all reasonable inferences in Plaintiffs' favor, it is clear that the Director Defendants purposefully directed their activities at residents of the forum through their requisite oversight of Carter Bank's transaction of business with Plaintiffs in West Virginia.  The Justice III Decl. eliminates any doubt, setting forth Mr. Justice III's personal knowledge that ***the Director Defendants routinely voted to approve*** Carter Bank's actions on the Plaintiffs' loans.  (Justice III Decl. ¶ 3.)  That conduct more than justifies the Court's exercise of jurisdiction over the Director Defendants in view of their reasonable anticipation of defending themselves in West Virginia courts.  The Director Defendants cannot hide behind their role as agents of Carter Bank to negate those substantial contacts with West Virginia.  *See Calder* v. *Jones*, 465 U.S. 783, 790 (1984) ("[the defendants'] status as employees does not somehow insulate them from jurisdiction.  Each defendant's contacts with the forum State must be assessed individually.").  The Director

---

[23] 141 S. Ct. at 1026 ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct.").

Defendants were not simply employees of Carter Bank: they directed, managed, and supervised Carter Bank's business, including its substantial business with Plaintiffs in West Virginia.[24]

It is therefore reasonable to infer, and Mr. Justice III's Declaration confirms, that the Director Defendants were fully aware of Carter Bank's loans to Plaintiffs and were actively engaged in the oversight and direction of those loans.  Indeed, a lesser degree of involvement would have constituted a patent violation of the directors' fiduciary duties.[25]

The reason for the Director Defendants' personal involvement in the Justice loans is self-evident:  Carter Bank's exposure to Plaintiffs was undoubtedly its largest exposure to any related group of borrowers.  Although a bank's legal exposure to any group of borrowers is 15%–25% of its capital, Carter Bank's exposure to the Justice Entities is today almost 100% of that capital and has been even higher in the past.  If Carter Bank's loans to Plaintiffs were placed on nonperforming status, its nonperforming loans would increase by 58 times and its nonperforming assets would increase by 13 times.[26]  The annual interest paid by Plaintiffs to Carter Bank historically constitutes a significant percentage of Carter Bank's income: in 2020, Plaintiffs estimate that the interest and fees they paid was approximately $28 million and constituted over one-third of Carter Bank's net interest income after provision for loan losses and approximately 24% of Carter Bank's interest and fee income from loans.[27]  In these circumstances, the Director Defendants' failure to engage

---

[24] West Virginia Code § 31-14-6 states that "[t]he business and affairs of the corporation shall be managed and conducted by a board of directors."  The Virginia Code also provides that a corporation's board of directors "manages" the corporation's actions.  Va. Code Ann. § 13.1-853(B). The Charter of Carter Bankshares, Inc., Carter Bank's parent company, provides that "[t]he management, control and government of the Corporation shall be vested in the Board of Directors".  (Bromley Decl. ¶ 6, Ex. 5.)  Carter Bankshares, Inc.'s Bylaws provides that "[t]he management of all the affairs, property, and business of the Corporation shall be vested in a Board of Directors."  (Bromley Decl. ¶ 7, Ex. 6.)

[25] See West Virginia Code § 31-14-6; Va. Code Ann. § 13.1-853(B).

[26] See Barter Bankshares, Inc., Current Report (Form 8-K) (July 29, 2021), at 14 (total nonperforming loans at $6.351 million and total nonperforming assets at $30.818 million).  (See Bromley Decl. ¶ 8, Ex. 7.)

[27] See Barter Bankshares, Inc., Annual Report (Form 10-K) (Mar. 12, 2021), at 86 (net interest income after provision for loan losses at $87.109 million and interest income from loans, including fees at $117.226 million). (See Bromley Decl. ¶ 9, Ex. 8.)  In that year, Carter Bank incurred a net loss of $46 million in 2020.  Id.

in active oversight of Carter Bank's loans to Plaintiffs would have constituted an abdication of their duties as fiduciaries.  It is a reasonable inference that a director would not act in that manner. Although a bank's director would not, of course, be expected to exercise active oversight and direction of all of a bank's loans, the loans to Plaintiffs were of such a size and importance to Carter Bank's financial condition as to demand such a level of involvement.

It is also a reasonable inference that Carter Bank's counsel has kept its Board well-informed about Plaintiffs' thus-far unavailing efforts to reach a settlement on the loans or to repay certain of the loans.  Although counsel has refused to permit any of Plaintiffs' numerous communications to be directly transmitted to the Board and insisted that all communications be channeled through him, it is a reasonable assumption that counsel has kept the Board informed and sought their direction.  This is particularly the case because Plaintiffs have repeatedly asked Carter Bank's counsel to inform the Board in light of his insistence that there be no direct communication.

As alleged in the Complaint, the Director Defendants fostered ongoing connections with West Virginia businesses and residents and benefited substantially from doing business in West Virginia.  The Justice family was (and, on Plaintiffs' reasonable belief, still is) by far Carter Bank's largest banking relationship, having paid Carter Bank at least $238.5 million in interest and fees over the years, and a substantial part of the Justice family's assets are located in West Virginia. (Cmplt. ¶¶ 18–31, 91.)  In addition, despite the repeated insistence in the Jurisdiction Motion that none of the Director Defendants has had any contact with West Virginia in connection with Plaintiffs,[28] Mr. Van Dyke and Ms. Karavatakis attended a meeting in White Sulphur Springs,

---

[28] *See, e.g.*, Jur. Mot. at 3 ("In fact, none of the Director Defendants has had any contact with or taken any action in West Virginia in connection with the allegations Plaintiffs make in the Complaint as supporting their claims against Carter Bank.") and at 7 ("Nor has any Director Defendant, whether as a representative of Carter Bank or otherwise,

West Virginia in May 2017 with representatives of Plaintiffs in connection with the banking relationship between Plaintiffs and Carter Bank.[29]

In addition, the Director Defendants directed their actions toward West Virginia by causing certain correspondence to be sent to the Justices at their West Virginia addresses.  For example, in a letter dated July 2, 2021, signed by Mr. Van Dyke and sent to White Sulphur Springs, West Virginia, Carter Bank demanded payments from the Justices of all outstanding amounts under certain loan documents.  (*See* Bromley Decl. ¶ 4, Ex. 3.)

The Director Defendants' reliance on *Columbia Briargate* is therefore misplaced.[30]  In that case, the Fourth Circuit held that "when a claim against a corporate agent rests on nothing more than he or she is an officer or employee of the nonresident corporation," there is no personal jurisdiction.  But that is plainly not the case here.  Plaintiffs' claims against the Director Defendants rest on reasonable inferences with respect to those individuals' actions and omissions in managing, directing and supervising Carter Bank, and their knowing and intentional oversight of Carter Bank's transaction of business in West Virginia.  Moreover, the *Columbia Briargate* court held that some showing of "direct personal involvement" by a corporate officer in the alleged wrongdoing warrants a finding of personal jurisdiction.  713 F.2d at 1063.  Here, the Director Defendants' management and control of Carter Bank falls squarely within the type of "direct personal involvement" contemplated by the *Columbia Briargate* court.  This includes the Director Defendants' votes to approve Carter Bank's action on Plaintiffs' loans as well as their refusal to communicate with Plaintiffs regarding Plaintiffs' attempts to pay off loans made to Plaintiffs

---

met with any of the Plaintiffs or their representatives in West Virginia to discuss any of the matters referenced in the Complaint.").

[29] Van Dyke Decl. ¶ 5; Karavatakis Decl. ¶ 5.

[30] *See* Jur. Mot. at 12.

17

headquartered and operating in West Virginia.[31]   For the Director Defendants to deny having authorized or directed any of Carter Bank's actions with respect to Plaintiffs would be an admission that they have abandoned their fiduciary duties as directors.  Plaintiffs have satisfied their burden on a motion to dismiss for lack of personal jurisdiction by making nonconclusory and plausible allegations that establish a *prima facie* basis for the exercise of jurisdiction by this Court. Reasonable inferences drawn from the Complaint shows that the Director Defendants were participants in the wrongdoing that harmed West Virginia businesses and residents and therefore are subject to jurisdiction in this forum.  *See Calder*, 465 U.S. at 790.

## B.   Plaintiffs' Claims Arise Out of the Director Defendants' Activities Directed at West Virginia

Although courts in this jurisdiction consider whether the plaintiff's claims arise out of activities directed at the State in determining personal jurisdiction, the Supreme Court has held in *Ford Motor Co.* v. *Mont. Eighth Judicial Dist.* Court, 141 S. Ct. 1017 (2021) that plaintiffs do not have to establish a causal connection between defendants' contacts with the forum state and the plaintiffs' claim for purposes of establishing personal jurisdiction.  Nevertheless, here, Plaintiffs' claims against the Director Defendants arise out of their activities directed at West Virginia.

As alleged in the Complaint, those activities include engaging in a pattern of deceptive and bad faith conduct towards Plaintiffs, including, without limitation, in Fall 2017, inducing certain Plaintiffs into defaults in order to obtain additional material rights in the form of cross-defaults and cross-collateralization and guarantees, and to protect themselves by demanding breathlessly

---

[31] The Director Defendants also argue that the BHCA does not apply to natural persons and thus does not provide any basis for imposing individual liability or asserting personal jurisdiction. (Jur. Mot. at 11 n.6.)  The cases that the Director Defendants cite do not support that proposition.  Importantly, those decisions fail to acknowledge that the private right of action under § 1972 is created by a completely separate provision—12 U.S.C. § 1975.  Moreover, legislative history clearly shows that natural persons can be sued in a private right of action. S. Rep. No. 91-1084 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 5519, 5536 (noting that individual is included within meaning of bank holding company if he possesses the requisite ownership or control of a bank).

4845-4783-2052 v.5

broad releases from Plaintiffs seeking to insulate Carter Bank from any repercussions from its bad faith prior actions, for which Plaintiffs did not receive adequate consideration.  (Cmplt. ¶¶ 57–66.) In addition, because a substantial portion of the collateral underlying the debt at issue in the Complaint is located in West Virginia, the Director Defendants' conduct alleged in the Complaint with respect to the banking relationship with Plaintiffs inherently relate to such property and therefore connect to this forum.  Moreover, consistent with *Ford Motor*, the Director Defendants have enjoyed the benefits and protection of West Virginia and therefore "it is only fitting for the defendants to be subject to the jurisdiction of the forum state."  *See Int'l Shoe Co.*, 326 U.S. at 319.

### C.  The Exercise of Personal Jurisdiction is Constitutionally Reasonable

The Supreme Court has noted three reasons why a State should be able to assert jurisdiction over nonresidents who purposefully direct their activities toward that State, all of which support the exercise of jurisdiction by this Court over the Director Defendants.  *First*, a State has an obvious interest in providing a forum for its resident to redress injuries inflicted by nonresidents. *Second*, it would be unfair not to allow jurisdiction where the defendant has derived benefits from the activities directed toward the forum State. *Finally*, modern methods of transportation and communication make it much less onerous now for a person to defend himself in a remote forum. *Burger King*, 471 U.S. at 473–74.

Thirteen Plaintiffs are West Virginia residents and the Justice Entities are deeply tied to the economic health of West Virginia—among other things, The Greenbrier resort is the State's largest resort and a historic landmark, and the Justices employ thousands of West Virginia residents.  As such, Plaintiffs have a clear interest in litigating this dispute in West Virginia and West Virginia has a clear interest in having this dispute litigated in its courts. *Ellicott*, 995 F.2d at 479 (holding that West Virginia has an "interest in adjudicating the action insofar as it seeks to ensure the economic health of its citizens and the fair resolution of their disputes.")

4845-4783-2052 v.5

In addition, by Director Defendants' various acts and omissions described herein, they should have reasonably expected to be sued in West Virginia arising from their conduct as directors of Carter Bank given Carter Bank's transaction of substantial business in West Virginia. Requiring the Director Defendants—who willingly serve on the board of directors of a for-profit multi-state corporation—is not a random or fortuitous exercise of jurisdiction and is entirely warranted. Defendants argue that litigating in this district would burden them. That is true in every case. Defendants have made no showing that the burden on them is any different than the ordinary burden of litigating outside of one's home district. What Defendants thus effectively are arguing is that a party should only be sued where they are located. That is not the law. *Alpha Welding*, 837 F. Supp. at 174 (finding it insufficient to tip the balancing test where the defendants were "less than a one-day drive from" the forum court).

Accordingly, the Court has personal jurisdiction over the Director Defendants and the Jurisdiction Motion should be denied with prejudice. In the event that the Court determines that Plaintiffs have not alleged facts from which reasonable inferences can be drawn to establish a *prima facie* case for personal jurisdiction over the Director Defendants, Plaintiffs respectfully request leave to amend the Complaint. Plaintiffs also reiterate their pending request for leave to conduct limited discovery on venue and personal jurisdiction issues, or, in the alternative and at minimum, request an evidentiary hearing on those issues.

## **CONCLUSION**

WHEREFORE, Plaintiffs respectfully request that this Court (a) DENY Carter Bank's Venue Motion, (b) DENY the Director Defendants' Jurisdiction Motion and (c) grant such other and further relief as is just and proper.

4845-4783-2052 v.5

Dated:  August 13, 2021
       Beckley, WV

*/s/* Steven R. Ruby
Steven R. Ruby (WVSB 10752)
David R. Pogue (WVSB 10806)
Carey, Douglas, Kessler & Ruby, PLLC
707 Virginia Street, East 901 Chase Tower
Charleston, WV 25301
Telephone: (304) 345-1234
Facsimile: (304) 345-1234
Email:  sruby@cdkrlaw.com
       drpogue@cdkrlaw.com

Christopher Schroeck (WVSB 13686)
Bluestone Resources, Inc.
302 S. Jefferson St.
Roanoke, Virginia 24011
Telephone:  (540) 492-4080, x211
Cellular:    (540) 986-5354
Email:  Chris.schroeck@bluestone-coal.com

-and-

**SULLIVAN & CROMWELL LLP**
H. Rodgin Cohen (WVSB 767)
James L. Bromley (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
Email:    cohenhr@sullcrom.com
       bromleyj@sullcrom.com
       bellerb@sullcrom.com
*Counsel to Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

BELLWOOD CORP., et al.

*Plaintiffs,*

v.                                               Civil Action No. 5:21-cv-00320
                                                 Honorable Frank W. Volk, Judge

CARTER BANK & TRUST, et al.

*Defendants.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of August, 2021, the foregoing "Plaintiffs' Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Pursuant to FRCP 12(B)(2) and (3)" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.


                                         __/s/ Steven R. Ruby_____
                                         Steven R. Ruby (WVSB No. 10752)